**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT** | **CIVIL ACTION NO.** |
| **OPPORTUNITY COMMISSION,** | **09-6460** |
| | |
| **Plaintiff** | |
| | **SECTION B** |
| **v.** | **JUDGE LEMELLE** |
| | |
| **BOH BROTHERS CONSTRUCTION** | |
| **COMPANY, LLC** | **MAG. 2 (WILKINSON)** |
| | |
| **Defendant** | |

---

**EEOC'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

I.     INTRODUCTION ............................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................ 2

III.   SUMMARY JUDGMENT LEGAL STANDARD .................................................. 5

IV.    LAW AND ARGUMENT ..................................................................................... 6

   A.   Sexual Harassment ...................................................................................... 6

      1.   Defendant's Harassment of Woods was Harassment "Because of Sex." ................. 7

      2.   The Harassment Was Unwelcome. ........................................................... 16

      3.   The Harassment Was Severe or Pervasive. ............................................. 18

      4.   Defendant Cannot Prove Its Affirmative Defense. .................................. 23

   B.   Retaliation ................................................................................................ 27

V.     CONCLUSION .................................................................................................. 30

CERTIFICATE OF SERVICE .................................................................................... 32

Plaintiff, the United States Equal Employment Opportunity Commission ("EEOC" or "Commission"), submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Motion"). For the reasons set forth below, Defendant's motion should be denied.[1]

## I.    INTRODUCTION

This is a "same sex" sexual harassment and retaliation case. The EEOC brought this suit to redress the injuries of Kerry Woods ("Woods"), a male employee, resulting from severe and pervasive harassment by his male supervisor, Charles Wolfe, III ("Wolfe"). Woods worked for Defendant, Boh Brothers Construction Company, LLC ("Boh Brothers" or "Defendant"), for over one year. For approximately seven months of that time, Wolfe harassed Woods on a daily basis. Wolfe repeatedly called Woods names with sexual connotations and which connote femininity, simulated having anal sex behind Woods, and exposed his penis to Woods. Wolfe also described Mr. Woods's use of wet ones at work as feminine. Supreme Court jurisprudence makes clear that discrimination for failure to conform to gender stereotypes constitutes discrimination because of sex.

Defendant also retaliated against Woods for complaining about the harassment. Woods's complaints to the job foreman had produced no action. When Woods complained to the Superintendent of the Department, Wayne Duckworth ("Duckworth"), about the harassment, Duckworth sent Woods home without pay. Some number of days later, Defendant assigned Woods to a new location, and a month or two later, ended his employment. Duckworth openly testified that because Woods complained about Wolfe's harassment, Duckworth sent Woods home without pay. In sum, there is ample evidence to support the EEOC's claims, and a plethora of genuine disputes of material fact foreclose summary judgment in Defendant's favor.

---

[1] The EEOC incorporates by reference its Exhibits and Statement of Contested Facts, submitted with its Opposition.

## II.      FACTUAL BACKGROUND

Defendant hired Kerry Woods to work as an ironworker on November 3, 2005.  (Def.'s Resp. to Pl.'s Req. for Admis. "RFA" at 3, Exh 1.)  Duckworth, general superintendent for Defendant's Heavy and Highway Department, hired Woods. (RFA at 3.)   Defendant first assigned Woods to work on repairs to the I-10 Twin Spans over Lake Pontchartrain. (RFA at 3.)  At some point during that project, Wolfe, a Boh Brothers supervisor, showed Woods "a picture of his ass." (Woods Dep. 122:5-14, Exh. 2.)   In approximately January of 2006, Defendant reassigned Woods to work on a maintenance crew on the I-10 Twin Spans. (RFA at 3.)  Woods's supervisors on the maintenance crew were Timothy Carpenter ("Carpenter"), foreman, and Wolfe, job superintendent. (RFA at 4; Carpenter Dep. 15, Exh. 3.)  Other members of the crew included Bobby Boswell, Harold Blades, Chuck Wolfe, IV, Charlie Mitchell, and T.J. Laborde.  The all-male crew was isolated on the Twin Spans and reported there for work every day.

In approximately April, 2006, Wolfe began harassing Woods.  The harassment included Wolfe calling Woods names such as "faggot," "pussy," and "Princess," and making jokes about Woods being gay.  (Woods Dep. 130:20; 153:20-25.)   Wolfe explained that Woods got the nickname "Princess" because:

> Mr. Woods sat down around this table with a bunch of big hairy ironworkers one day and told us that he brings his Wet Ones to work, that he didn't feel like toilet paper did a good job, that he kept his Wet Ones so he could stay fresh and clean all day.  So that was just like an incentive to rib him, pick on him about it, so he was known as "Princess."
> Q: Did it seem feminine to you that he brought Wet Ones to work?
> A: Kind of.

(Wolfe Dep. 71, Exh. 4.)[2]  One time Woods awoke from a nap in his locked car and

---

[2] Wolfe also commented that using Wet Ones is "kind of gay … That sounded like a homo." (Wolfe Interview "Int." 11:20-24, Exh 5.)  During the EEOC's investigation, it conducted interviews of several Boh Brothers' employees. Duckworth and Wolfe gave sworn statements. The EEOC attaches the transcripts of these interviews. (Exhs. 5, 9.)

found Wolfe trying to open his door and motioning as if he were zipping up his pants. Wolfe said something like, "If that car door would have been open, my penis might have been in your mouth." (Woods Dep. 131:12-14.)  Defendant admits Wolfe made profane remarks to Woods, and called Woods names with sexual connotations.  (RFA at 5-6.)

The harassment was not only verbal.  On at least 10 occasions, Wolfe showed Woods his penis. (Woods Dep. 136-39.)  On other occasions, Wolfe would stand behind Woods and simulate having anal sex with him.  Woods testified that "during the day if I was bending over to work, he'd get behind me and act like he was . . . humping me, having sex with me." (Woods Dep. 139:15-19.)  This would happen just about any time Wolfe was around and Woods had to bend over to work. (Woods Dep. 141:1-4.)  Wolfe's and Woods's descriptions of Wolfe's behavior are very different.  While Wolfe admits that he called Woods names, including "princess," "queer," "gay," "homo," and "faggot," engaged in other actions, such as throwing pennies at Woods, and once caused Woods to cry after making a reference to Woods's daughter growing up to be a stripper,"[3] he also claims "It never got out of hand to where we hurt anybody's feelings.  It may have been technically inappropriate, but wasn't never offensive.  It wasn't mean or derogatory towards Mr. Woods in any way." (Wolfe Int. 10, 14; Wolfe Dep. 80-81.)  Woods found Wolfe's continuous harassment to be severe and unwelcome. (Woods Decl. ¶ 4, Exh. 6; Woods Dep. 132, 134-35, 141, 206, 220-21.)   Woods did not directly protest the harassment to Wolfe because he wanted to protect his job and was afraid of retaliation. (Woods Dep. 132:22-25 – 133:1-11; 155:15-20.)

---

[3] "I didn't say anything offensive.  I said, how would you like that if some asshole went in here one day and your daughter's working at Wal-Mart and gets her fired.  She could wind up on a stripper pole . . ." (Wolfe Int. 14.)

Woods complained to his foreman, Carpenter, multiple times about the harassment.[4] (Woods Dep. 141-42.)  Although Carpenter told Woods he would speak with Wolfe, he never did. (Woods Dep. 142; Wolfe Dep. 56-57.)  In November of 2006, Woods complained about the sexual harassment to Duckworth. (RFA at 7; Duckworth Dep. 75:4-12, 82:5-10, Exh. 7.)[5] Woods had gone to see Duckworth in November 2006 after Wolfe sent him off of his job site. Woods went to the job inspectors (Volkert) and asked to see his timesheet to make sure he was getting paid for all the time he worked. (Woods Dep. 158.)  Wolfe claims he assumed that Woods was trying to see if other employees were getting paid for time they were not working, and without asking Woods if that was the case, sent him off the job. (Wolfe Dep. 59.)   Wolfe then told Carpenter "That he had gotten rid of him."  (Carpenter Dep. 29.)  Wolfe testified that after Woods left his job site, that's the last he heard of Woods for a few months. (Wolfe Int. 19.)

After Woods made his complaint, Duckworth decided that Woods could not return to working on the maintenance crew, and sent him home. (Duckworth Dep. 92-93.)  As a result, Woods had no job within Boh Brothers to report to, and lost wages. (Duckworth Dep. 93:17-21; Woods Dep. 170; RFA at 8.)  Duckworth's sending Woods home, without pay, for multiple days, was a more severe adverse action than Defendant's discipline of two other employees who had admitted to using racial slurs, who were each suspended for one day without pay. (Duckworth Dep. 58-60.)  The alleged harasser, Wolfe, remained on the maintenance crew for at least the next two years.  Although Defendant admits that it found Wolfe to have engaged in inappropriate conduct, Wolfe never lost any pay over his conduct. (RFA at 10-11.)  Following Woods's complaint, Defendant investigated whether Wolfe engaged in any conduct that violated company

---

[4] "I would tell him I didn't like how he acted. . . . I didn't like him playing with me so much, cussing me. I asked him, "Could you -- could you say something?" (Woods Dep. 142:12-17.)
[5] When Woods complained to Duckworth about Wolfe's harassment, Woods also told Duckworth about other [continued]

policies and "demoted" him for three months for using company equipment without permission, for committing safety violations, and for his conduct towards Woods. (Def.'s Resp. to Interrog. 7 at 11, Exh. 8.)  Defendant continues to employ Wolfe as a supervisor. (RFA at 11.)

A few days after Duckworth had sent Wolfe home – which Mr. Woods understood to be a termination – Woods spoke with Carpenter, who told him to report to the Almonaster Yard. (Woods Dep. 174.)  Woods worked as an additional welder at the yard and was laid off in February, 2007.  Defendant admits that Woods performed his duties in a satisfactory manner at all times. (RFA at 3-4; Duckworth Dep. 74:15-20.)  The maintenance contract on the Twin Spans lasted at least two years. (Wolfe Dep. 26.)  Defendant continues to work on the Twin Spans. (Carpenter Dep. 11-12.)  Duckworth could not recall any layoffs of employees working on the maintenance project from when it began until some time in 2009, 4 years later. (Duckworth Dep. 163-64).[6]  Mr. Woods is the only ironworker who had worked on the Twin Span maintenance project who was terminated, and was the only one who complained of discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (*See* Duckworth Dep. 163:25 - 164:1-3; Carpenter Dep. 68; Wolfe Dep. 101-02.)

## III.   SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  The moving party bears the burden of identifying portions of the record that demonstrate the absence of a genuine

---

concerns with Wolfe, such as that he might be stealing company gas for personal use. (Woods Dep. 164:16-21.)
[6] Carpenter, Wolfe, Laborde, and Blades still work for Defendant, Boswell retired, Mitchell passed away, and Wolfe's son either quit or was terminated. (Carpenter Dep. 68-69; Wolfe Dep. 101-02.)

issue of material fact. *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir. 2007).  The Court must construe all facts and inferences in the light most favorable to the nonmovant and cannot weigh evidence or evaluate the credibility of witnesses, *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

## IV.   LAW AND ARGUMENT

### A.  Sexual Harassment

Defendant violated Title VII by subjecting Woods to sexual harassment by his supervisor.  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  This protection against discriminatory treatment because of sex is not limited to harassment perpetrated by a member of the opposite sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998); *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 477-78 (5th Cir. 2002).  Plaintiff can establish a Title VII violation by proving that: (1) Woods belonged to a protected class; (2) Woods was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a "term, condition, or privilege" of employment. *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434 (5th Cir. 2005). [7] Following the Supreme Court's companion decisions in *Burlington Industries., Inc. v. Ellerth*,

---

[7] While in a case of co-worker sexual harassment, the Plaintiff must also prove that the employer knew or should have known of the harassment and failed to take prompt remedial action, that is not required when the alleged harasser is a supervisor. *Harvill*, 433 F.3d at 434; *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), an employer is vicariously liable for a supervisor's actionable hostile environment sexual harassment of an employee unless the employer can prove *both* elements of the affirmative defense.[8]

Defendant concedes that Woods is a member of a protected class, but challenges the second, third, and fourth elements of Plaintiff's sexual harassment claim.  As discussed below, Defendant's Motion should be denied because there are material issues of fact regarding whether (1) the harassment was based on Woods's sex, male, because of his failure to conform to his supervisor's notions of how a man should act; (2) Woods was subjected to unwelcome sexual harassment; and (3) the harassment was severe or pervasive, as the humiliating and offensive conduct recurred over a period of approximately seven months.  Finally, Defendant cannot prove the affirmative defense as a matter of law, because Defendant has a palpably ineffective system in place to prevent and deter sexual harassment and it is undisputed that Woods complained about the harassment, thereby seeking to avoid harm.

### 1.  Defendant's Harassment of Woods was Harassment "Because of Sex."

Wolfe harassed Woods because of sex, by harassing him about his failure to conform to Wolfe's notions of how a man should act.  In *Oncale*, the Supreme Court held that same sex harassment is actionable under Title VII. 523 U.S. at 79.  The plaintiff in *Oncale* worked on an oil platform in the Gulf of Mexico as part of an eight-man crew. 523 U.S. at 77.  Three members of the crew, in the presence of the rest of the crew, subjected plaintiff to "sex-related, humiliating actions," physically assaulted the plaintiff, and threatened him with rape. *Id.* at 77.  Plaintiff quit as a result of the sexual harassment.  In reaching its holding, the Supreme Court reasoned that

---

[8] Defendant must prove (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher,* 524 U.S. at 807.

"Title VII's prohibition of discrimination 'because of … sex' protects men as well as women" and "must extend to sexual harassment of any kind that meets the statutory requirements." *Id.* at 78, 80.  The Court described several evidentiary avenues available to a plaintiff seeking to establish that harassment by a member of the plaintiff's sex was harassment because of sex. *Id.* at 80-81.  In particular, the Court observed that the "easy" inference of sexual harassment based on explicit or implicit proposals of sexual activity is available in cases of same sex harassment where there is "credible evidence that the harasser was homosexual." *Id.* at 80.  The Court recognized, however, that, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id.*[9]  In fact, in *Oncale*, there is no evidence that any of the harassers were homosexual. *See Schmedding v. TNEMEC Co., Inc.*, 187 F.3d 862, 865 (8th Cir. 1999).[10]  While the Supreme Court provided three examples of typical ways a plaintiff *might* prove discrimination because of sex, the Court did not hold that the three examples constitute an exhaustive list.  Rather, the Court concluded, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* … because of … sex.'" *Id.* at 81.  The critical question, therefore, is whether Wolfe harassed Woods because he is a man.

The Supreme Court's holding in *Oncale* requires only that the plaintiff prove, in accordance with Title VII, that the discrimination was because of sex.  "[W]e discern nothing in the Supreme Court's decision indicating that the examples it provided were meant to be

---

[9] The Supreme Court's acknowledgement that sexual desire need not be shown to establish sexual harassment highlights that "because of sex" means because of the gender – maleness or femaleness – of the victim.  Therefore, the EEOC uses the terms "sex" and "gender" as synonymous in this Opposition.

[10] In *Schmedding*, the court noted that *Oncale* "dealt with [a] claim[] of same-sex harassment by heterosexual males against a heterosexual male plaintiff." 187 F.3d at 865 (citing *Oncale*, 523 U.S. at 77).

exhaustive rather than instructive. The Court's focus was on what the plaintiff must ultimately prove rather than the methods of doing so.  Indeed, the Court has previously made clear that the means of proving discrimination cannot be reduced to rigid formulae." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999) (citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)). *See also, e.g., Pedroza v. Cintas Corp.*, 397 F.3d 1063, 1068 (8th Cir. 2005) (describing the list of evidentiary routes as "non-exhaustive"); *James v. Platte River Steel Co.*, 113 F. App'x 864, 867 (10th Cir. 2004) (same); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001).[11]  "What matters, then, is not whether the facts that [plaintiff] has alleged correspond exactly to any of the examples the Supreme Court has identified, but whether a reasonable factfinder could infer from those facts that [plaintiff] was harassed 'because of' his sex." *Shepherd*, 168 F.3d at 1009. The Fifth Circuit has also recognized that the Supreme Court's "focus [in *Oncale*] was on what the plaintiff must ultimately prove rather then the methods of doing so." *La Day*, 302 F.3d at 478 (quoting *Shepherd*, 168 F.3d at 1009).

In keeping with the Supreme Court's instructions on what the plaintiff must "ultimately prove," some courts directly address the issue of whether the harassment was because of sex, without identifying a particular evidentiary route, similar to how courts treat opposite sex harassment cases.  For example, in *Price v. Dolphin Services, Inc.*, 99-3888, 2000 WL 1789962 (E.D. La. 2000), the court denied Defendant's motion for summary judgment in a same sex harassment case, holding that the conduct "could constitute harassment based on sex which would offend Title VII." *Id.* at *5.  The conduct the court referenced included plaintiff's supervisors and co-workers calling him "fairy boy," "cupcake," "faggot," and "Joe's bitch."

---

[11] *See also* Clare Diefenbach, *Same-Sex Sexual Harassment After Oncale: Meeting the "Because of … Sex" Requirement*, 22 Berkeley J. Gender, L. & Just. 42, 74 (2007) ("*Oncale* does not require that a plaintiff prove his or her case under one of the three evidentiary routes described in that opinion.").

They also gave him a signed card on Secretary's Day with two condoms taped on the inside cover of the card and the handwritten notes, "If you were a real man you could use this," and "Doing a great job sweetie-David." *Id.* at *1. Plaintiff also found a pipe plug with a condom rolled over it on his desk and was subjected to other harassment, such as his mail being opened and taken. *Id.* at *1. Similarly, in *Ashmore v. Thayer Co., Inc.*, 303 F. Supp. 2d 1359 (M.D. Ga. 2004), another same sex harassment case, the Court held, without specifying a particular evidentiary route, that "sufficient evidence was presented from which a reasonable jury could have concluded that [the supervisor's] harassment of Plaintiffs was based upon their male gender. . . . [The supervisor's] conduct, which was reserved only for male employees and included the simulation and discussion of sexual acts between males, supports the jury's conclusion that the harassment was gender based." *Id.* at 1369.[12]

Other courts, using the *Price Waterhouse* framework, have explicitly held that same sex harassment was "because of sex" where the plaintiff was harassed for failure to conform to the stereotype of his or her gender. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).[13] In *Price Waterhouse*, the Supreme Court held that a plaintiff can prove discrimination because of sex under Title VII through evidence of discrimination for failing to conform to a gender stereotype. The plaintiff in *Price Waterhouse*, a female senior manager, alleged discrimination on the basis of sex when her partners refused to propose her for partnership. 490 U.S. at 231-32. Partners had described Hopkins as "macho," in need of "a course at charm school," and suggested she would improve her chances for partnership if she would "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear

---

[12] Although the court held the harassment was because of sex, it granted defendant's motion on other grounds.
[13] *Price Waterhouse* was superceded in part by statute on other grounds. *See* 42 U.S.C. § 2000e-5(g); *Smith v. Xerox Corp.*, 602 F.3d 320, 327 (5th Cir. 2010).

jewelry."[14] 490 U.S. at 235 (citations omitted).   The Supreme Court determined that "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." 490 U.S. at 250.   The Court further noted that sex stereotyping is legally relevant within the framework of Title VII:

> [W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for "[i]n forbidding employers to discriminate against individuals *because of their sex*, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

490 U.S. at 251 (emphasis added) (quoting *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).

Title VII prohibits discrimination on the basis of sex, including discrimination on the basis of sex stereotypes.   This prohibition applies to all types of sex discrimination, including sexual harassment. *See, e.g., Dawson v. Bumble & Bumble,* 398 F.3d 211, 218-21 (2d Cir. 2005) (recognizing gender stereotyping claim); *Medina v. Income Support Div. of N.M.,* 413 F.3d 1131, 1135 (10th Cir. 2005) (same); *Smith v. City of Salem, Ohio,* 378 F.3d 566, 571-73 (6th Cir. 2004) (overturning dismissal of sexual stereotyping harassment claim based on transsexual male plaintiff's allegations that his conduct and mannerisms did not conform with other employees' stereotypes of how a man should be); *Nichols v. Azteca Rest. Enters.,* 256 F.3d 864, 874-75 (9th Cir. 2001) (recognizing Title VII same sex harassment claim after plaintiff proved he was harassed because of sex by coworkers who referred to him in female terms and ridiculed his allegedly female mannerisms); *see also Bibby,* 260 F.3d at 263-64; *Simonton v. Runyon,* 232 F.3d 33, 37-38 (2d Cir. 2000); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 259,

---

[14] The Supreme Court viewed the comments made about plaintiff as direct evidence of gender discrimination. *Id.* at 235.   The Court concluded that where direct evidence was sustained neither indirect evidence of discrimination nor inference was necessary. *See Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir. 1994).

261 n.4 (1st Cir. 1999); *Doe v. City of Belleville,* 119 F.3d 563, 580-83 (7th Cir. 1997), *vacated on other grounds,* 523 U.S. 1001 (1998) (noting that a man who is harassed because "his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex").[15]

Under applicable Supreme Court precedent, where co-workers and/or supervisors, particularly in an all male work environment, harass a male plaintiff for "feminine" behavior or attributes, it may constitute harassment "because of sex."  In *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002) (en banc), for example, the court held that a male employee stated a claim for sexual harassment where several of the other male butlers subjected him to a hostile work environment, including whistling, blowing kisses, calling plaintiff "sweetheart" and "muñeca" (Spanish for doll), telling crude jokes, showing plaintiff pictures of naked men having sex, and engaging in offensive physical conduct of a sexual nature. *Id.* at 1064.  The court compared the conduct to that of the all-male workplace in *Oncale*, and concluded that it was "a fairly straightforward sexual harassment claim." *Rene*, 305 F.3d at 1068. Three Judges, concurring in the opinion, noted that it was "a case of actionable gender stereotyping harassment." *Id.* at 1068 (Pregerson, J., concurring).[16]

The Eastern District of Louisiana, and other district courts within the Fifth Circuit, have

---

[15] Defendant argues that *Doe* is no longer good law. *Doe* included two alternative holdings. Some courts conclude the second holding on the basis of sex stereotyping was not vacated by *Oncale*. *See, e.g., Bibby*, 260 F.3d at 263 n.5.

[16] The concurrence further noted that "[a]ll-male workplaces are common sites for the policing of gender norms and the harassment of men who transgress such norms." *Id.* at 1069 n.3 (citing Margaret Stockdale, Michelle Visio, and Leena Batra, *The Sexual Harassment of Men: Evidence for a Broader Theory of Harassment and Sex Discrimination*, 5 Psychol. Pub. Pol'y & L. 630, 653-54 (1999) (. . . finding that data from a Department of Defense sexual harassment survey "support the trend that same-sex sexually harassed men worked in more male-dominated workplaces than did other men"); Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1755 n.387 (1998) ("[M]any male workers may view not only their jobs, but also the male-dominated composition and masculine identification of their work, as forms of property to which they are entitled.")).

also recognized that harassment on the basis of sex stereotypes is harassment "because of sex." *See Oiler v. Winn-Dixie Louisiana, Inc.*, 00-3114, 2002 WL 31098541, *4 (E.D. La. Sept. 16, 2002) ("In *Price Waterhouse,* the United States Supreme Court held that discrimination on the basis of sex or gender stereotyping was discrimination because of "sex" within the meaning of Title VII.").  The court in *Oiler* did not apply *Price Waterhouse* to the case before it because the plaintiff in *Oiler* did not present evidence that he was harassed because he did not conform to a gender stereotype.  The court distinguished the case before it from *Price Waterhouse*, noting that "Plaintiff is not making a Title VII claim for sexual harassment based upon rumors in his workplace that he was gay or that co-employees referred to him using demeaning terms, such as "sissy", or any other inappropriate term used by some to refer to a male who does not fit a masculine sexual stereotype." 2002 WL 31098541 at *2 n.42.  Although the court did not find that gender stereotyping had occurred in *Oiler*, it did recognize that if the facts had been different, then the Supreme Court's holding in *Price Waterhouse* would have been applicable. *See also Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008) (holding that "Title VII is violated when an employer discriminates against any employee, transsexual or not, because he or she has failed to act or appear sufficiently masculine or feminine enough for an employer.") (internal quotation omitted).

This legally-recognized form of sexual harassment is also scientifically-recognized. Plaintiff submits as Exhibit 1, Appendix A to the EEOC's opposition to Defendant's *Daubert* motion (R. Doc. 35), an expert report from Dr. Gold, a forensic psychiatrist and Clinical Professor of Psychiatry at Georgetown University.  Dr. Gold is an award-winning author in the field of sexual harassment, including the sub-field of same sex harassment.[17]  Dr. Gold notes that

---

[17] Dr. Gold's extensive credentials are discussed more fully in the EEOC's opposition to Defendant's *Daubert* [continued]

same sex sexual harassment, such as that described by Woods, "is a means of insulting and humiliating another man by equating insufficient masculinity with homosexuality." (Gold Report at 3, R. Doc. 27-3.)  "In this type of sexual harassment, men are predominantly the targets of other men's vulgar jokes, teasing, put-downs or sexual hazing." (Gold Report at 3.)  Dr. Gold's report is based on scientific research in the field of psychiatry and psychology concerning the motivations for same-sex harassment.[18]

Wolfe harassed Woods because of his sex.  Similar to the harassment in *Dolphin Services*, where the plaintiff was called names such as "fairy boy" and "cupcake," here, Woods's supervisor called him names similarly connoting femininity, such as "princess," "faggot," and "pussy." *Id.* at *1; (Woods Dep. 130; Wolfe Dep. 70, 81.)  Both supervisors also implied that the object of the harassment was not a "real man." *Id.* at *1; (Wolfe Int. 9) (describing Woods's behavior as "kind of feminine.")  These comments show that Woods, like the plaintiff in *Dolphin Services*, was discriminated against because of his sex.  Additionally, Wolfe simulated anal sex behind Woods every time he would bend over, exposed his penis to Woods, showed him a picture of his buttocks, and referenced having oral sex with Woods.[19]  (Woods Dep. at 122, 131, 139) ("If that car door would have been open, my penis might have been in your mouth.")  As the Court concluded in *Ashmore*, "the simulation and discussion of sexual acts between males, supports the . . . conclusion that the harassment was gender based." 303 F. Supp. 2d at 1369.

Dr. Gold's report scientifically confirms that Wolfe's alleged behavior fits recognized patterns of harassment because of failure to conform to gender stereotypes.  Dr. Gold opines that:

---

motion. (R. Doc. 35.)  That opposition attaches a Declaration from Dr. Gold, including a copy of her expert report and her deposition.  The EEOC incorporates Dr. Gold's Declaration, report, and deposition as part of its Opposition to Defendant's Motion for Summary Judgment.

[18] Defendant has offered no countervailing expert, and has not attempted to challenge the validity of the recognized science in the field of psychiatry concerning same sex harassment.

[19] Although Wolfe testified that he "rode other employees like a horse," but not Woods, this contradicts the [continued]

1.  Mr. Wolfe's alleged conduct is consistent with a form of scientifically  . . . recognized harassment because of sex due to a harasser's perceptions that the target of harassment is not conforming to accepted gender stereotypes.

2. The facts as alleged by Mr. Woods as well as Mr. Wolfe's admissions would support a reasonable conclusion that Mr. Wolfe harassed Mr. Woods based on his perception that Mr. Woods displayed "feminine" behavior not consistent with the masculine stereotype Mr. Wolfe associated with "a bunch of rough ironworkers."

(Gold Report at 2.)  There is ample evidence that Wolfe discriminated against Woods because he did not conform to Wolfe's stereotype of a man, particularly of an ironworker.  For example, in an interview with EEOC personnel, Wolfe testified as follows:

Mr. Woods sat at a table with a bunch of ironworkers and told us that he brought, you know, feminine wipes -- not feminine wipes -- but Wet Ones or whatever to work with him because he didn't like to use toilet paper.  It's not the kind of thing you want to say in front of a bunch of rough ironworkers that we had there.  They all picked on him about it.  They said that's kind of feminine to bring these -- that's for girls.  You bring these Wet Ones to work to wipe your ass, and you damn sure don't sit in front of a bunch of ironworkers and tell them about it.  You keep that to yourself if that's in fact what you do.

(Wolfe Int. 9:6-20.)  Dr. Gold describes this testimony by Wolfe as fitting "this common type of same-sex sexual harassment." (Gold Report at 4.)  Dr. Gold reports that in single sex dominant groups, "anyone who does not appear to conform in some way becomes likelier to be the target of this type of harassment." (*Id*.)  Consistent with this research, Duckworth testified that others described Woods as "different," and noted that "He didn't fit in." (Duckworth Int. 20:3-5, Exh. 9; Duckworth Dep. 73:16; 131:25 – 132:11) (other workers "complained about he was different. They brought up sensitive, that kind of thing.")  It is also undisputed that on one occasion, Mr. Woods cried as a result of Mr. Wolfe's behavior, which is not in conformity with a "bunch of rough ironworkers," to use Wolfe's phrase. (Wolfe Dep. 79:3; Woods Dep. 147:5-11.)

Wolfe's harassment of Woods for acting "kind of feminine," was harassment of Woods

---

testimony of Kerry Woods and creates an issue of fact that cannot be resolved by the Court on summary judgment.

because of his sex – because he did not conform to Wolfe's stereotypical notion of what a man should be.  "[J]ust as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity." *Higgins,* 194 F.3d at 261 n.4 (citing *Price Waterhouse*, 490 U.S. at 250-51).   A jury could more than reasonably conclude that Woods was perceived in the workplace as feminine and not conforming to gender stereotypes concerning "manliness."

Defendant cites a 1978, pre-*Price Waterhouse* case, *Smith v. Liberty Mutual Ins. Co.*, 569 F.2d 325 (5th Cir. 1978), to argue that the Fifth Circuit does not recognize gender stereotyping as proof of sexual harassment and "that discrimination arising from the belief that the plaintiff did not conform to the stereotypes of his gender is not protected."  (Def.'s Mot. at 21, 22, n.8.)  This argument is no longer valid: "that harassment stemming from the employee's failure to meet the stereotypical expectations of his gender is not discrimination 'against a man because he is a man,' … is drawing an inference that is foreclosed by the Supreme Court's subsequent decision in *Price Waterhouse*." *Doe*, 119 F.3d at 592; *see also Higgins,* 194 F.3d at 261 n.4.[20]

## 2.   The Harassment Was Unwelcome.

Wolfe engaged in verbal and physical conduct of a sexual nature that Woods found unwelcome, undesirable, and offensive.   The Fifth Circuit has defined "unwelcome sexual harassment" as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee." *Marquez v. Voicestream Wireless Corp.*, 115 F.

---

[20] Defendant's reliance on *Mims v. Carrier Corp.*, 88 F. Supp. 2d 706 (E.D. Tex. 2000), is likewise unavailing to the extent that *Mims* relied on *Smith* and other pre-*Price Waterhouse* cases.  There is also no indication that the parties before the court briefed the applicability of *Price Waterhouse*, as the Court neither mentions, nor rejects it.

App'x 699, 701 (5th Cir. 2004) (quoting *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)).[21]   In *Wyerick*, the district court had granted the defendant's motion for summary judgment, holding that the sexual jokes and comments about plaintiff were "just an overall situation that existed out there," and "the plaintiff participated in it."  The Fifth Circuit reversed, noting that although the plaintiff herself had potentially made three sexual comments, they were "limited replies to the onslaught of sexual remarks and gestures," and reasoning that the "intensely factual inquiry anticipated by the Court in *Meritor* requires the issue of unwelcomess to go to the trier of fact in this case." *Id.* at 1275 (citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57 (1986)).[22]   The Fifth Circuit further concluded that if the district court held that plaintiff was barred from a hostile environment claim "because her work atmosphere, as a whole, was heavily charged with sexual comments and gestures, this was error.   Work environments 'heavily charged' or 'heavily polluted' with racial or sexual abuse are at the core of the hostile environment theory." *Id.*   Finally, the Court definitively rejected the argument that harassing conduct is not "unwelcome," merely because it is prevalent in that work environment:

> If the district court purported to hold that entering into such an atmosphere "welcomed" abuse, that position was rejected by the Court in *Meritor*.  Moreover, such a rule would serve as a reward for incompetence. Managerial personnel in working environments heavily charged with sexual or racial slurs and abuse would actually be deterred from taking remedial action because such action would eliminate their "heavy pollution" defense.

---

[21] In *Wyerick*, the Fifth Circuit applied Title VII to plaintiff's state law sexual harassment claim. 887 F.2d at 1274.
[22] Defendant cites *Vaughn v. Pool Offshore Co.*, 683 F.2d 922 (5th Cir. 1982), a case decided before both the Supreme Court's decision in *Meritor Savings Bank* and the Fifth Circuit's decision in *Wyerick*.  To the extent the analysis cited by Defendant survives *Meritor*, the case discusses a claim for race discrimination, and nowhere analyzes the test for unwelcome sexual harassment.  The case is further distinguishable because the plaintiff in *Vaughn* apparently testified that employees of all races were subjected to the same treatment, that the plaintiff himself used racial slurs, and the plaintiff did not believe that the treatment was racially motivated. *Vaughn*, 683 F.2d at 924-25. Here, there is no evidence that Woods engaged in verbal and physical conduct of a sexual nature like that to which he was subjected. *See also Watkins v. Texas CES, Inc.*, No. 08-243-Y, 2009 WL 3424736, *6 n.12 (N.D. Tex. Oct. 26, 2009) ("This Court additionally notes that *Vaughn* was decided in 1982.  The Court hopes that more than twenty-five years after *Vaughn*, this type of incendiary and patently offensive language cannot be viewed as "routine" or as mere "rowdiness" in any type of work environment.").

*Id.* at 1275 n.11 (internal citation and quotation omitted).

Here, Defendant's own proffered witnesses concede that the kind of harassment Woods alleges was not commonplace or acceptable. (*See, e.g.*, Duckworth Dep. 86:22–87:1, 152:11-14; 30(b)(6) Dep. 99:22–100:1, Exh 10.)[23]   Defendant admits that it "demoted" Mr. Wolfe because of his inappropriate conduct.  Defendant cannot, therefore, plausibly assert that Wolfe's conduct was "the norm."  Further, Woods testified that the conduct was unwelcome.  When asked if he did not like Wolfe's remarks and gestures Woods testified, "No.  I went to work to work and make money for my family.  I never gave him a reason to think it was all right to play with me like that." (Woods Dep. 134:20-25 – 135:1-2.)  He also testified that Wolfe's behavior bothered him, and that he did not like it.  "Who would like looking up and have a man purposely trying to get you to look at their penis?" (Woods Dep. 132; 206, 220-21.)  Finally, Woods testified that he "got tired of it." (Woods Dep. 141:5-9; *see also* Woods Decl. ¶ 4.)  There is no record evidence to suggest that Woods welcomed the harassment; even Defendant's citations do not suggest that Woods it was welcome.  For example, Defendant's citation to the declaration of Harold Blades provides "Woods told me he did not like the name calling." (Blades Decl. ¶ 4, R. Doc. 28-9; *see also* Boswell Decl. ¶ 3, R. Doc. 28-10.)   Not one factual citation in Defendant's Motion regarding the unwelcome conduct is to Woods's testimony, illustrating at the very least a factual dispute precluding summary judgment. *Wyerick*, 887 F.2d at 1275.

### 3.  The Harassment Was Severe or Pervasive.

Wolfe's severe and pervasive harassment over a period of approximately seven months

---

[23] Duckworth stated that if the facts were as Woods alleges, he "wouldn't like it very much." (Duckworth Dep. 94:4-11.)  Duckworth readily concedes, therefore, that if the conduct is as Woods alleges – which must be accepted for purposes of this motion – it would be unwelcome, and not just "kidding around."

created a hostile work environment.[24]   In order for sexual harassment to be actionable under Title VII, the harassing conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harvill,* 443 F.3d at 434. An allegation that same-sex harassment rises to the level of a hostile work environment is subject to the same standard applied in cases of opposite-sex harassment. *La Day*, 302 F.3d at 481.   "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Meritor Sav. Bank*, 477 U.S. at 67 (quoting *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.1999)).   Finally, courts determine whether a work environment is "hostile" or "abusive" by considering the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harvill*, 433 F.3d at 434 (quoting *Harris v. Forklift*, 510 U.S. 17, 23 (1993)).

Plaintiff need only establish that the abusive conduct was severe or pervasive, not both.[25] *Lauderdale v. Tex. Dep't of Crim. Justice,* 512 F.3d 157, 163 (5th Cir. 2007).  In *Lauderdale*, the court held that although the conduct might not have risen to the level of severity required in other decisions, it was pervasive, and therefore stated a viable hostile work environment claim. *Id.* at 163-64.   The pervasive conduct included, among other things, 10-15 phone calls during

---

[24] Defendant also argues that Woods did not suffer a "tangible employment action" (Def.'s Mot. at 15-17).  The EEOC does not contend that this is a case of quid pro quo harassment.

[25] "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of pervasive, thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Lauderdale v. Tex. Dep't of Crim. Justice,* 512 F.3d 157, 163 (5th Cir. 2007) (internal quotations and citations omitted).

plaintiff's shift for a period of approximately four months, an invitation to "snuggle," an incident where the supervisor grabbed her handcuff case and pulled her towards him, and asking her to get coffee. *Id.* at 164 ("Though Lauderdale does not assert that each phone call carried sexual overtones, the frequency of unwanted attention, over a four-month time period, amounts to pervasive harassment."). Finally, "sexual comments alone can rise to the level of actionable harassment." *See Harris*, 510 U.S. at 19, 21-23; *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 805-06 (5th Cir.1996) (affirming refusal to grant judgment notwithstanding the verdict for employer where the only alleged harassment was verbal); *Donaldson v. CDB Inc.*, 335 F. App'x 494, 502 (5th Cir. 2009) (reversing grant of summary judgment on hostile work environment claim where plaintiff presented evidence that for period of five months she was subjected to sexually-suggestive comments regarding her physical appearance and relationship with her boyfriend, and was called "stupid," in addition to other non-sexually-charged actions).

In same sex harassment cases, courts have held that fewer incidents than those Woods was subjected to, and over a shorter period of time, created issues of fact as to whether a plaintiff was subjected to a hostile work environment, precluding summary judgment. In *La Day*, for example, the Fifth Circuit held that the plaintiff's allegations that his supervisor "made obnoxious comments about La Day's sexuality, inappropriately touched a private part of La Day's body, and spat tobacco juice on him," all within the span of one month, created an issue of fact as to whether plaintiff was subjected to a hostile work environment, sufficient to survive summary judgment. 302 F.3d at 476, 482 (holding that plaintiff's supervisor's "conduct was physically 'humiliating'; even if not 'threatening' it was arguably severe, and there is a disputed question of fact whether it unreasonably interfered with La Day's work performance."). In *Dolphin Services*, the court denied Defendant's motion for summary judgment, holding that the

harassing conduct supported plaintiff's hostile work environment claim. 2000 WL 1789962 at

*1, 5.   The court reasoned that "the barrage of comments and questions of a personal nature

about the plaintiff's perceived sexual orientation," in addition to the other incidents "in totality

evince a hostility toward plaintiff in the workplace." *Id.* at *5.

Here, the harassment was both subjectively and objectively offensive. *See Frank v. Xerox

Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).   Woods testified that he did not like Wolfe's remarks

and gestures and asked Carpenter multiple times to ask Wolfe to stop. (Woods Dep. 132, 134:20-

25 – 135:1-2, 141:5-9, 206, 220-21.)   As noted above, Defendant's own declarations contain

statements declared under penalty of perjury that Woods was upset by Wolfe's conduct.  (*See*

Boswell Decl. ¶3.)   The harassment was also objectively severe or pervasive.  Defendant admits

that it demoted Wolfe in part because of his behavior towards Woods. (Def.'s Resp. to Pl.'s

Interr. at 11.)   Defendant also admits that, taking Woods's allegations as true, Wolfe's conduct

could violate Defendant's policies concerning sexual harassment.[26]   Defendant's testified that it

would consider the alleged conduct objectively offensive behavior.  (30(b)(6) Dep. 99:22–100:1-

4; *see also* Duckworth Dep. 94:4-11.)   This is also not reasonably foreseeable "male-on-male

horseplay."   Duckworth testified that in his 20 years working at Boh Brothers, he has seen

swearing and other crude actions, but "To say I've actually witnessed some that have gone this

far, no." (Duckworth Int. 16.)   Additionally, Dr. Gold, a recognized scholar in the field of

psychiatry and social and behavioral sciences on the subject of same sex harassment, notes that

this sort of conduct is generally highly offensive to men. (*See* Gold Report at 4.)

This harassment was also more severe and/or more pervasive than that experienced by

---

[26] RFA No. 96: "The conduct on the part of Mr. Wolfe, alleged by Mr. Woods in [a Declaration], if true, would violate Defendant's policies concerning sexual harassment."   Response: "Defendant admits such conduct could violate Defendant's policies." (RFA at 15.)

the plaintiffs in *Price* and *La Day*. The name-calling in *Price* and the "obnoxious comments" in *La Day* are similar to the names Wolfe repeatedly called Woods. Woods was also subjected to repeated and unwanted sexual comments and gestures by Wolfe. (Woods Dep. 130-31, 136-39, 153.)   Both cases also involved harassment which lacked inherent sexual undertones, including opening mail and spitting tobacco juice, which is akin to the other harassment Woods was subjected to, including having pennies thrown at him. (Wolfe Dep. 77:15)

The case law cited by the Defendant is distinguishable on the issues of severity and pervasiveness. For example, in *Esparza v. Telerx Marketing*, 2005 WL 1514046, *3 (W.D. Tex. 2005), *aff'd* 174 F. App'x 806 (5th Cir. 2006), the Court cites one offensive action, and references without detail other incidents that were not pervasive as they took place over three months, but did not occur on a recurring basis during that time. *Id.* at *3. Here, Woods testified that Wolfe exposed his penis multiple times and that Wolfe would pretend he was having anal sex with him virtually every time Wolfe was around and Woods had to bend over to work. (Woods Dep. 141:1-4.)   *See also Lauderdale*, 512 F.3d at 163 n.1 (distinguishing *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (cited by Defendant) and *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 871-75 (5th Cir. 1999) (cited by Defendant), and noting that the relevant test is not just the severity of the harassment, but how pervasive it is).

Defendant's logically bankrupt and baseless attempt to use Woods's work proficiency against him, by arguing that because Woods continued to perform his work in a satisfactory manner despite the harassment, ignores that this is a totality of the circumstances test. *Harvill*, 433 F.3d at 434. Whether the harassment interferes with an employee's work performance is one factor a plaintiff may use to prove a hostile work environment, but is not a required element

of a *prima facie* case.  Such a requirement would perversely punish the plaintiff who is able to perform well *despite* the hostile work environment to which he is subjected.  Here there is ample evidence that the conduct was frequent, lasted approximately seven months, and was physically humiliating, which, considering the totality of the circumstances, is sufficient to show it was severe or pervasive. *See Bacon v. Art Institute of Chicago*, 6 F. Supp. 2d 762, 767 (N.D. Ill. 1998) ("denying summary judgment in same sex harassment case and reasoning that "[o]ne can hardly imagine a more humiliating experience for an employee than being called into a room by a supervisor, being told to bend over, and having the supervisor simulate anal sex in front of coworkers.").[27]

### 4.   Defendant Cannot Prove Its Affirmative Defense.

Defendant has failed to demonstrate the absence of a genuine issue of material fact on either prong of its affirmative defense, and therefore is not entitled to summary judgment. *Washburn,* 504 F.3d at 508.  Defendant bears the burden of proof on this defense.  An employer is vicariously liable for a supervisor's actionable hostile environment sexual harassment of an employee unless the employer can prove that: (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, *and* (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765.

First, Defendant has not demonstrated the absence of any material issues of fact regarding whether it exercised reasonable care to prevent and correct promptly any sexually harassing

---

[27] *See also* Gold Report at 4 ("An unwanted and offensive body gesture indicating anal intercourse between two presumably heterosexual men is similar to such a gesture from a man to a woman, in the sense that it is offensive and degrading.  However, with men, it carries the added implication that the man who is the target of the offensive behavior is a socially nondominant homosexual, and therefore adds an additional level of insult or degradation to an already offensive behavior.").

behavior.  Defendant did not exercise reasonable care to prevent sexually harassing behavior because it did not institute policies and trainings that would prevent it.  While Defendant has a policy that prohibits discrimination on the basis of sex, it does not list "sexual harassment" as prohibited conduct nor does it define what sexual harassment is.[28]  Defendant's training is also inadequate.  The training consists of bi-monthly "safety meetings" and weekly Monday morning meetings.  The Monday morning meetings last five to ten minutes and are run by the foreman, who may or may not understand the topic he is covering. Carpenter, for example, admitted that he could not always answer questions during a Monday morning meeting, nor was he always familiar with the topics. (Carpenter Dep. 44-45.)  When Wolfe is a foreman, he is the person who runs the meetings. (Wolfe Dep. 108-09.)  Wolfe does not recall receiving any training on sexual harassment in his 14 years with Boh Brothers. (Wolfe Dep. 30) ("Q: Did you ever, at Boh Brothers, receive any training about sexual harassment? A: No.")  Wolfe also testified that it was not until after Woods worked at Boh Brothers that he was aware of the company ethics code:

> Q: And during the time that you've worked at Boh Brothers, starting as an equipment operator, have you received any training about employment discrimination?
>
> A: Again, just a general ethics code that came out after this incident.  We received a code of ethics.  We went over it generally, kind of at a safety meeting, but we were told to read it and abide by it.
>
> Q: And when you say "this incident," are you referring to Kerry Woods' complaints?
>
> A: Yes.
>
> Q: And were you aware of whether there was an ethics code before Kerry Woods worked for you?
>
> A: I wasn't aware.  I mean, I – No.
> ….

---

[28] See Statement of Equal Employment Opportunity Boh Bros. Construction Co., L.L.C. (R. Doc. 28-14.)

Q: Before you received that copy, did you ever learn about any kind of employment discrimination during the safety meetings?

A: Formal training? No.

Q: Was there informal training?

A: No training.

(Wolfe Dep. 28, 29.)  Further, although the ethics code prohibits discrimination on the basis of sex, Wolfe did not understand that to include sexual harassment. (Wolfe Dep. 108.)  Duckworth testified that he received maybe five minutes of training on sexual harassment, about once a year, when it was covered during a job safety meeting.  (Duckworth Dep. 40-41, 161:10-24.)  As a result of their lack of training, Defendant's supervisory employees do not understand what sexual harassment is, nor are they trained in how to recognize a sexual harassment complaint.[29] Although Duckworth said Woods complained about the name calling, Wolfe mistreating him, and Wolfe exposing his penis to him, Duckworth still did not consider it to be a sexual harassment *complaint*. (Duckworth Int. 17:10-17; Duckworth Dep. 75:4-12, 102:14-20.)

Defendant also did not exercise reasonable care to correct promptly any sexually harassing behavior.  Duckworth testified that he could never find that someone had been sexually harassed without definitive proof, something likely to be lacking in a majority of sexual harassment cases. (Duckworth Dep. 141-42.)

A.  Like I say, I think some of that probably did take place.  How much and what, I don't know.   You know, and the only thing I could really do was what I did at the time and that was separate them.  Like I say, I've found the truth is always somewhere in between.  I'm not there to really judge.

(Duckworth Int. 14-15.)   Additionally, although Duckworth claims that he conducted an investigation into Woods's complaints about Wolfe's behavior, Wolfe himself cannot remember

---

[29] Carpenter thinks sexual harassment is "anything inappropriate." (Carpenter Dep. 48.)

speaking to Duckworth about his behavior until months after Woods left his crew, if at all.[30] (Wolfe Dep. 86-87) (claiming he was not aware of Woods's complaints until "a few months after he left the bridge" and the first time he knew about the accusations was when he "heard it on the news.")   Duckworth did not document a single interview in connection with his purported investigation into Mr. Woods's allegations. (Duckworth Dep. 104-05; RFA at 13-14.) Nevertheless, his investigation – which was clearly insufficient as an effective means of preventing and addressing harassment – was consistent with Defendant's policies and practices. (*See* Def.'s Resp. Pl.'s Interr. at 10.)   In short, the evidence shows that Defendant had no effective system in place to protect employees from unlawful harassment.

Second, Defendant cannot show that as a matter of law Woods unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.   There is a disputed issue of fact as to whether Woods complained multiple times to his foreman, Carpenter, and it is undisputed that Woods complained about the harassment to Duckworth. (Duckworth Dep. 75:4-12, 82:5-10) ("He complained that he was being mistreated out there, that Chuck Wolf was saying things about his wife, his daughter, complained that Chuck Wolf exposed himself to him.").[31]   Unlike the plaintiff in *Lauderdale*, 512 F.3d at 164-65, after Woods's complaints to his foreman, Carpenter, proved ineffective, he complained to Duckworth.[32]   As it is undisputed that Woods did complain, Defendant cannot show that Woods failed as a matter of law to avail himself of the complaint procedures. *See*

---

[30] There is definitive evidence, however, that Woods's telling Duckworth that Wolfe might be using company equipment was thoroughly and professionally investigated, by a private investigator. (RFA at 11.)

[31] Defendant's assertion that Woods did not complain until he was transferred is unsupported by the Record and shows multiple issues of material fact that preclude summary judgment. (Def.'s Mot. at 20.)  Woods testified that he complained to Carpenter about how Wolfe was "playing" with him.  Carpenter's testimony contradicts Woods's, therefore creating a material issue of fact. (*See* Carpenter Dep. 24:16-21.)  Woods also complained to Duckworth, by Defendant's own admission, approximately three days before he was assigned to the yard.

[32] Woods could not complain to Wolfe, as he was the alleged harasser. *See Donaldson*, 335 F. App'x at 505.

*Watts v. Kroger Co.,* 170 F.3d 505, 510-11 (5th Cir. 1999) (holding that a genuine issue of material fact existed about whether waiting to complain was unreasonable and citing *Fall v. Indiana University Bd. of Trustees*, 12 F. Supp. 2d 870 (N.D. Ind. 1998) (holding that defendant failed to make out its affirmative defense as a matter of law because it was undisputed that the plaintiff took advantage of the defendant's anti-harassment policy, and a jury could find that the plaintiff's delay in reporting the harassment was not unreasonable)).

### B. Retaliation

Defendant retaliated against Woods after he complained to Duckworth about the harassment. Defendant sent Woods home, without pay, an action more severe than Defendant's discipline of employees who admittedly used racial slurs in the workplace, and then transferred Woods to another worksite.[33] The anti-retaliation provision of Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006).

In a circumstantial evidence case, a plaintiff establishes a *prima facie* case of unlawful retaliation by proving (1) that he engaged in activity protected by Title VII; (2) that a materially adverse action occurred;[34] and (3) that a causal connection exists between the protected activity and the adverse employment action. *LeMaire v. State of Louisiana*, 480 F.3d 383 (5th Cir. 2007);

---

[33] Duckworth testified that a foreman and superintendent had each received a one day suspension without pay. The foreman was punished for using the term "nigger rigging" and the superintendent referred to somebody in a meeting as the "HNIC," which Duckworth understood to mean "head nigger in charge." (Duckworth Dep. 58-60.)

[34] In *Burlington Northern*, the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68.

*Burlington Northern*, 548 U.S. at 68.  Close timing between an employee's protected activity and

an adverse action may provide the causal connection for a *prima facie* case of retaliation. *McCoy*

*v. City of Shreveport*, 492 F.3d 551, 562 n.28 (5th Cir. 2007).  If the plaintiff makes out a *prima*

*facie* case of retaliation, under the burden-shifting framework set forth in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802-03 (1973), the burden shifts to the employer to articulate a

legitimate, non-discriminatory reason for the employment action. *Aryain v. Wal-Mart Stores Tex.*

*LP*, 534 F.3d 473, 484 (5th Cir. 2008).  If the employer satisfies its burden of production, the

plaintiff must have sufficient evidence to prove at trial that the defendant's proffered legitimate,

non-discriminatory reason is pretext for a retaliatory purpose. *Id.*

When a plaintiff produces direct evidence of unlawful motivation, however, the employer

can prevail only by proving that it would have taken the same action even in the absence of the

discriminatory motive. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004);

*Forrest v. Dynamic Security, Inc.*, 2002 WL 255503, *7-9 (E.D. La. 2002).  Where a plaintiff

produces direct evidence of discrimination, summary judgment for the employer is inappropriate.

*See e.g. Rachid,* 376 F.3d at 315-16 (holding that direct evidence of ageist comments, such as

"you're too old, too" precluded summary judgment "because a rational finder of fact could

conclude that age played a role in [the] decision to terminate [plaintiff]."); *Templet v. Hard Rock*

*Construction Co.*, 02-0929, 2003 WL 181363, *5 (E.D. La. Jan. 27, 2003); *Bass v. Lifecare*

*Holdings, Inc.*, 99-1864, 2000 WL 377815, *7 (E.D. La. Apr. 12, 2000).

Here, Woods engaged in protected activity when he complained to Duckworth about

Wolfe's harassment. *See Green v. Adm'rs of Tulane Educ. Fund,* 284 F.3d 642, 657 (5th Cir.

2002) (finding employee's harassment complaint protected activity).  Defendant admits that Mr.

Woods engaged in protected activity.[35]   After Woods complained, he was subjected to a materially adverse action – he was sent home without pay for multiple days.[36]   Presenting evidence that the defendant suspended an employee without pay after the employee engaged in protected activity is sufficient to establish a plaintiff's *prima facie* case. *LeMaire*, 480 F.3d at 390 (holding that plaintiff's suspension was an adverse employment action, "as a two-day suspension without pay might have dissuaded a reasonable employee from making a charge of discrimination").   Finally, there was a causal connection between the protected activity and the adverse employment action.   Duckworth admits he sent Woods home – immediately - without pay because of his complaint, thus providing direct evidence of retaliation.[37]   Additionally, the immediacy of the action against Woods supports a causal connection. *LeMaire*, 480 F.3d at 390 (finding two weeks between report and suspension supportive of a causal connection); *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding less than two months between the protected activity and adverse action sufficient to demonstrate a causal connection). Therefore, plaintiff has provided evidence of a *prima facie* case of retaliation. Defendant has not articulated any legitimate, non-discriminatory reason for sending Woods home without pay after he complained about Wolfe's harassment.[38]

---

[35] (30(b)(6) Dep. 71-72.) ("Q. Would you consider his complaining to Mr. Duckworth about Mr. Wolfe's conduct a protected activity? A. Yes.")

[36] Woods thought he was fired. (Woods Dep. 155.)   Regardless of what terminology is used, Defendant admits Woods could not earn any salary or report to work during this time period. (Duckworth Dep. 92-93.)

[37]  "Q. Where did you tell Mr. Woods he should go after the conversation? A. I believe what I did was, I think -- it has been awhile.  But I think he went home.  I think I told him it would be best if he went home.  If it was the way it was.  Certainly you don't want to go for some more of that." (Duckworth Dep. 92-93.)  Duckworth also testified that he later assigned Woods to the Yard and that Woods could not work on the maintenance crew. (*Id.* at 95:7-14.)  The evidence therefore would also support a jury finding that Duckworth's sending Woods to the yard was retaliatory as it was causally connected to Woods's complaint.  If a proper system existed to prevent harassment, Defendant would have removed Wolfe, or allowed Woods to remain on the maintenance crew and done something to prevent Wolfe from continuing to harass Woods.

[38] Defendant cannot articulate a legitimate, non-discriminatory reason for sending Woods home without pay. Duckworth testified that Woods had done nothing wrong and was not being punished. "Q. When you sent Mr. Woods home, did you not think he had done anything wrong? A. No, I didn't send him home – like I say, it wasn't [continued]

However, because in this case there is direct evidence of retaliation, the *McDonnell Douglas* burden-shifting paradigm, which pertains to circumstantial evidence cases, does not even apply.  As noted, Duckworth openly states that he sent Mr. Woods home without pay, and then assigned him to work in the Yard, specifically because Woods complained about Wolfe's harassment.  Duckworth states that he did so to separate the employees while he "investigated" the allegations. (Duckworth Dep. 92-93.)  As Plaintiff has produced direct evidence of unlawful motivation, the employer can only prevail by proving that it would have taken the same action even in the absence of the discriminatory motive.  As Defendant bears a heavy burden of proof with respect to its own state of mind, the best case scenario for Defendant is that this leaves a question for the jury. *See, e.g.*, *Bass,* 2000 WL 377815 at *7 ("'A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail' in defeating defendant's summary judgment motion.") (quoting *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 40 (5th Cir.1996)).

## V.     CONCLUSION

For the reasons set forth above, and based on the evidence submitted and incorporated with this Opposition, including the EEOC's Exhibits and Statement of Contested Facts, Defendant has not met its burden under Rule 56 to establish, through admissible evidence, the absence of any genuine disputes of material fact.  The EEOC therefore respectfully requests that the Court deny Defendant's motion.

---

punishment. I didn't see anything wrong. I just didn't want these things I was being told to escalate." (Duckworth Dep. 97.) Defendant could have taken actions not materially adverse to Woods, such as sending Woods home *with* pay, bringing in another Supervisor to replace Wolfe, or ensuring Wolfe did not continue to harass Woods.

Respectfully submitted,

**P. DAVID LOPEZ**
General Counsel
No Bar Roll Number Assigned
**JAMES L. LEE**
Deputy General Counsel
No Bar Roll Number Assigned
**GWENDOLYN YOUNG REAMS**
Associate General Counsel
No Bar Roll Number Assigned
**JIM SACHER**
Regional Attorney
La. Bar Roll Number 14888
Equal Employment Opportunity
Commission
Houston District Office
Mickey Leland Federal Building
1919 Smith Street
Houston, Texas 77002-8049
Direct Line: (713) 209-3398

/s/ Tanya L. Goldman
**GREGORY T. JUGE**
Senior Trial Attorney
La. Bar Roll No. 20890
**TANYA L. GOLDMAN**
Trial Attorney
No Bar Roll Number Assigned
**U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**
New Orleans Field Office
1555 Poydras Street
Suite 1900
New Orleans, LA  70112
Tel:     (504) 595-2878 (Main Legal #)
          (504) 595-2877 (Juge)
          (504) 595-2914 (Goldman)
Fax:     (504) 595-2886 or 589-6861
**COUNSEL FOR PLAINTIFF,
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a copy of the foregoing has been served on counsel of record for all parties, via email, United States mail, postage pre-paid, via facsimile transmission, via hand delivery, via E.C.F., or via next day delivery.


<u>February  11, 2011</u>                      <u>/s/ Tanya L. Goldman</u>
Date                                         Tanya L. Goldman