**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION    *    CIVIL ACTION
   *
VERSUS    *    NO. 09-6460
   *
BOH BROTHERS CONSTRUCTION COMPANY, LLC    *    SECTION "B"(2)

<u>ORDER AND REASONS</u>

Before the Court is Defendant's Motion for Summary Judgment seeking summary judgment of Plaintiff's claims of sexual harassment claim and retaliation (Rec. Doc. No. 31). For the reasons pronounced below,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Rec. Doc. No. 31) is **DENIED. IT IS FURTHER ORDERED** that Defendant's attempt to raise the *Ellerth/Faragher* affirmative defense at this stage of the proceedings is **DENIED WITHOUT PREJUDICE** to Defendant to reurge the defense at trial.

I. <u>Cause of Action and Facts of Case</u>

This same-sex sexual harassment and retaliation case, brought by the EEOC under pertinent provisions of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991 as amended, arises from events which transpired during the period in which Kerry Woods ("Woods") was employed by Defendant.[1] Woods was hired by Defendant as an iron worker on November 3, 2005 and was

---

[1] For purposes of this memoranda, both Plaintiff, EEOC and Mr. Woods, when not referenced by name, will collectively be refereed to as "plaintiff" or "respondent."

1

initially "assigned to repair work that placed one of the Twin Span bridges back into service." (Rec. Doc. No. 31-1 at 2). Plaintiff alleges that at some point during his assignment on that project, Charles "Chuck" Wolfe, a project supervisor, "showed Woods a picture of his ass." (Rec. Doc. No. 36 at 4). Woods was reassigned in January of 2006 to work on a maintenance crew on the Twin Span; in this reassignment, Woods' foreman was Timothy Carpenter and the job superintendent was Wolfe.[2] *Id.* Defendant states that iron workers on this repair crew "had problems with" Woods because he would not join the Ironworkers' union, thus project superintendent Wayne Duckworth placed Woods on the maintenance repair crew. Volkert was the state's separate inspection contractor which over work performed on the project by Defendant and kept the employees' time records. (Rec. Doc. No. 31-1 at 2).

In April, 2006, Plaintiff alleges that Wolfe began harassing Woods; Defendant says that Wolfe began "treating Woods in an unprofessional manner." (Rec. Doc. Nos. 36 at 4; 31-1 at 2). Plaintiff alleges that the harassment included calling Woods names including "'faggot,' 'pussy,' and 'Princess,' and making jokes about Woods being gay." (Rec. Doc. No. 36 at 4) (citing Woods Dep. 130:20; 153:20-25). Wolfe admitted as much in his interview with

---

[2]The other members of the maintenance crew were Harold Blades, Bobby Boswell, Charlie Mitchell, T.J. Laborde, and Charles Wolfe, IV. (Rec. Doc. No. 31-1 at 2).

the EEOC and his deposition.[3]   (Rec. Doc. No. 36-4 at 21-22).
Wolfe stated in his deposition that Woods was called "Princess"
because he discussed using Wet Ones wipes at work rather than
toilet paper; Wolfe stated that that seemed feminine to him.   *Id*.
(citing Wolfe Dep. 71).   During an interview with Wolfe conducted
by the EEOC, Wolfe stated that using those wipes was "kind of gay
. . . . [t]hat sounded like a homo."   (Rec. Doc. No. 36-5 at 4).
In one instance recounted by Woods, he awoke from napping in his
car and found Wolfe attempting to open his car door, "motioning as
if he were zipping up his pants . . . . [and] said something like,
'If that car door would have been open, my penis might have been in
your mouth.'"[4]   (Rec. Doc. No. 36 at 5) (citing Woods Dep.
131:12-14.)[5]

Additionally, Woods testified at his deposition that, on at
least ten occasions, Wolfe showed Woods his penis while he urinated
off the bridge.   *Id*.   Wolfe testified that he never intentionally
exposed himself to Woods.   (Rec. Doc. Nos. 36-4 at 30; 36-5 at 7).

---

[3]Wolfe added that he didn't call Woods anything he did not call his own
son who also worked in the maintenance crew.   (Rec. Doc. No. 36-4 at 22).

[4]In his deposition, Woods stated that he took Wolfe's comment to be a
crude joke and not an invitation to have oral sex with Wolfe.   (Rec. Doc. No.
31-3 at 30).

[5]This court would not usually reproduce such gratuitously crude language
in its opinions.   "Here, however, [an] . . . essential dispute concerns
whether the language and actions of [Wood]'s [] supervisor constituted
actionable sexual harassment . . . . To indulge in delicacy . . . would
obscure the issue before this Court."   *Bibby v. Philadelphia Coca Cola
Bottling Co.*, 260 F.3d 257, 260 n.3 (3rd Cir.2001) (internal citations
omitted).

Woods also testified that almost every time he would bend over to work in Wolfe's presence, Wolfe would stand behind him and simulate having anal sex with him.  (Rec. Doc. No. 36 at 5).

In one incident Woods and Wolfe were having a discussion about Woods' interaction with a waitress in which she did not give him correct change and "[a]ccording to Woods, Wolfe said that Woods might have cost the waitress her job and if Woods' daughter became a stripper he would not tip her." (Rec. Doc. No 31-1 at 3).  This upset Woods and he began to cry, Defendant states that "[t]his was the only thing that Woods told Wolfe had bothered him."  *Id*. Plaintiff states that "Woods did not directly protest harassment to Wolfe because he wanted to protect his job and was afraid of retaliation."  (Rec. Doc. No. 36 at 5).  Defendant cites the testimony of Wolfe and others on the maintenance crew that Woods would joke back with the crew and call his coworkers names (Rec. Doc. No. 31-1 at 2)(citing Rec. Doc. No. 31-4 at 11; 43; 46-47).

In November, 2006, Defendant alleges that Woods went to the office and asked Volkert inspector Boudreaux to see the time entries of the crew in violation of company policy.[6]  (Rec. Doc. No. 31-1 at 3).  Boudreaux stated that he informed Wolfe, Wolfe told Duckworth and Wolfe, acting on instructions from Duckworth told Woods to report to the Almonaster yard wherein Woods told

---

[6]Wolfe stated in his deposition that similar conduct had resulted in the termination of T.J. Laborde although at the time of the alleged harassment, Laborde had been rehired and was working on the maintenance crew.  *Id*.

4

Duckworth of the harassment. *Id*. Defendant sates that this conversation with Duckworth was "the first time Woods complained to anyone regarding Wolfe's harassing behavior." *Id*. Woods, however states he spoke to his foreman, Tim Carpenter on occasion about the alleged harassment and Carpenter said he would speak with Wolfe although apparently, he did not. (Rec. Doc. No. 31-3 at 13-14; Rec Doc. No. 31-4 at 4). After speaking with Duckworth about the alleged harassment and stating that he thought Wolfe was stealing gasoline and time from the company, Duckworth sent Woods home without pay for three days while he looked into the allegations.[7] (Rec. Doc. No. 31-1 at 4). Wolfe was not sent off the maintenance crew during Duckworth's investigation. Although Duckworth states he considered it, Wolfe was needed as he stored equipment at his home which was close to the job site and there "were no other qualified superintendents immediately available to take over Wolfe's duties." *Id*. Defendant sates however that Wolfe was reprimanded and demoted from superintendent to operator foremen due to his "inappropriate conduct and for using company equipment without first getting permission." *Id*. at 5.

Duckworth investigated the matter and said that "[i]n his view, both Wolfe and Woods had engaged in inappropriate behavior,

---

[7]Plaintiff notes that this action was more stringent than its dealings with two other employees who admitted to using racial slurs and were each suspended for one day without pay. (Rec. Doc. No. 36 at 6).

but he did not consider it to be sexual harassment.[8]  (Rec. Doc. No. 31-1 at 4) (citing Rec. Doc. No. 31-3 at 48).  When Woods returned, he was assigned to work in the equipment yard until January 2007 when, as Defendant alleges, he was "laid off because there was a lack of work" in that department. *Id.*  Woods came back to work for Defendant in February, 2007 to work in the pile driving department and was "laid off for lack of work" in that department on February 11, 2007.  *Id*.

Plaintiff states that Defendant continues to work on the Twin Spans and that Woods was the only ironworker who worked on the project, complained of discrimination, and who was terminated. (Rec. Doc. No. 36 at 7).

## II. <u>Parties' Contentions</u>

Movant contends that the EEOC's same-sex hostile work environment claim must fail as it cannot satisfy the elements articulated by the Fifth Circuit as necessary to state an actionable claim for same under Title VII.  (Rec. Doc. No. 31-1 at 6).  Citing to precedent, Movant attempts to raise the *Ellerth*/*Faragher* affirmative defense to vicarious liability.  *Id*. at 7.  Although Movant argues that the conduct complained of was neither unwelcome nor sufficiently severe or pervasive, Movant primarily contends that Respondent's claim must fail because it has

_____

[8]Defendant also notes that Duckworth's investigation found that "while Wolfe's behavior was unprofessional and not up to Boh Brothers' standards, no harassment had occurred."  (Rec. Doc. No. 31-1 at 6).

not demonstrated that Woods was harassed "because of sex;" specifically, Movant argues that Respondent has not produced evidence that Wolfe is homosexual. (Rec. Doc. No. 31-1 at 8-10). Movant states in its reply that Respondent "failed to state a recognized cause of action for sex stereotyping . . . ." (Rec. Doc. No. 40 at 2). In that reply, Movant calls Respondent's allegations "delinquent in that they were raised for the first time in [Respondent's] opposition" to the instant motion. *Id.*

Movant also submits that Plaintiff's retaliation claim must be dismissed as Plaintiff neither engaged in protected activity, suffered adverse employment action; nor can it show a causal link between any protected activity and adverse employment action. (Rec. Doc. No. 31-1 24-30). Movant further states that it has proffered a legitimate non-retaliatory reason for moving Woods from the maintenance crew to the Almonaster yard; i.e. because he asked to view the other employees' time records. *Id.* at 27. Movant points to Woods' deposition in which he states that he felt Wolfe sent him to the yard as a result of his complaining about the alleged harassment despite Wolfe's telling him that he was sending him to the yard for "going behind [Wolfe's] back and [trying] to look at the time [records of other employees]." (Rec. Doc. No. 31-3 at 28) Movant also points to Woods' EEOC intake questionnaire on which he stated that the reason for his termination was

7

"insubordination." (Rec. Doc. NO. 31-1 at 27).

Respondent contends that Movant, through Wolfe, sexually harassed Woods in violation of Title VII under a theory of "gender stereotyping." Respondent also contends that Woods was suspended for three days without pay as retaliation for making his complaint.

III. <u>Law and Analysis</u>

A.   <u>Summary Judgment Standard</u>

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas,* 139 F.3d 532, 536 (5th Cir. 1998). The nonmovant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Id.* Accordingly, conclusory

8

rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.* 7 F.3d 1203, 1207 (5th Cir. 1993).

B.  Title VII Claim of Sexual Harassment

A plaintiff may state an actionable claim for sexual harassment in violation of Title VII by proving that the complained of harassment created a hostile work environment. *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir.2005). "To establish a hostile work environment claim [a plaintiff] must demonstrate that (1) [Plaintiff] is member of a protected group;[9] (2) [Plaintiff] was the victim of uninvited sexual harassment; (3) the harassment was based on sex; [and] (4) the harassment affected a 'term, condition, or privilege" of [Plaintiff's] employment' . . . ."[10]  *Id.*  Furthermore, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

---

[9]The parties do not dispute that Woods is a member of a protected class. Rec. Doc. No. 31-1 at 7.

[10]Although a plaintiff stating a claim for same against a co-worker must also prove an additional fifth element, i.e. that "[Plaintiff's] employer knew or should have known of the harassment and failed to take prompt remedial action." *Harvill*, 433 F.3d at 434, the Fifth Circuit has held that a plaintiff need only prove the first four elements when, as in the instant case, the alleged harasser is a supervisor. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir.1999).

While the inquiry regarding severity or pervasiveness considers a totality of the circumstances, factors considered in assessing that inquiry include the frequency of the conduct, the severity of the conduct, and whether the conduct is physically threatening or humiliating or merely offensive language. *Harvill*, 274 F.3d at 434. The factors are considered objectively and subjectively, i.e. from the reasonable person viewpoint and the viewpoint of the claimant himself. As the Fifth Circuit stated in *La Day v. Catalyst Technology Inc.*, 302 F.3d 474, 478 (5th Cir.2002) the severity or pervasiveness element requires a showing that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." (quoting *Oncale v.Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 81 (1998))(internal quotations omitted).

    1.   <u>Harassment "because of" Sex</u>

The Supreme Court in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79-80 (1998) held "that nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not

exposed." *Id*. at 80.

One passage of the *Oncale* opinion is cited by both parties;
the excerpt is cited by Movant as the exhaustive list of
evidentiary paths by which the plaintiff in a same-sex sexual
harassment claim under Title VII may prevail; Respondent claims the
passage's text indicates that it is merely illustrative. (*See* Rec.
Doc. No. 31-1 at 8-9; Rec. Doc. No. 36 at 10). The noted passage
states:

> Courts and juries have found the inference of
> discrimination easy to draw in most male-female sexual
> harassment situations, because the challenged conduct
> typically involves explicit or implicit proposals of
> sexual activity; it is reasonable to assume those
> proposals would not have been made to someone of the same
> sex. The same chain of inference would be available to a
> plaintiff alleging same-sex harassment, if there were
> credible evidence that the harasser was homosexual. But
> harassing conduct need not be motivated by sexual desire
> to support an inference of discrimination on the basis of
> sex. A trier of fact might reasonably find such
> discrimination, for example, if a female victim is
> harassed in such sex-specific and derogatory terms by
> another woman as to make it clear that the harasser is
> motivated by general hostility to the presence of women
> in the workplace. A same-sex harassment plaintiff may
> also, of course, offer direct comparative evidence about
> how the alleged harasser treated members of both sexes in
> a mixed-sex workplace. Whatever evidentiary route the
> plaintiff chooses to follow, he or she must always prove
> that the conduct at issue was not merely tinged with
> offensive sexual connotations, but actually constituted
> *discrimination* because of sex.

*Id*. at 80-81 (emphasis in original)(quotations and ellipses
omitted). The *Oncale* decision did not provide an exclusive listing

of ways to establish such a claim but merely listed examples of avenues of proof.  This court is unconvinced that the type of claim here, gender stereotyping, as a matter of proof, is one that is susceptible to summary judgment at this stage of the proceedings. Additionally, Plaintiff's claim of hostile work environment does not rise to level of summary disposition as it creates minimally disputed issues of material fact regarding that claim.

Accordingly, this court need not engage in an in-depth analysis of whether Plaintiff's claim of same-sex sexual harassment has followed any of the three examples of evidentiary avenues outlined by the Court in *Oncale*.  Respondent's assertion of "gender stereotyping" as a method of proving same-sex sexual harassment is herein addressed.

2.  <u>Gender Stereotyping</u>

No part of the opinion in *Oncale* suggests that the pertinent passage is intended as an exhaustive list of the methods by which a Plaintiff claiming same-sex harassment in violation of Title VII may prove that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Oncale*, 523 U.S. at 80. (emphasis omitted).  The Fifth Circuit in *La Day*, 302 F.3d at 478, a Title VII same-sex harassment case stated that the Court in *Oncale* "*outlined* three ways in which a plaintiff *can show* that an incident

12

of same-sex harassment constitutes sex discrimination."[11] (emphasis

supplied).  Similarly, Judge Barbier, in his opinion in *Love v.*

*Motiva Enterprises, LLC*, 2008 WL 4286662 at *9 (E.D. La. 2008)

*supra* stated:

> The existence of a claim for sexual stereotyping under
> Title VII was first suggested by the Supreme Court in
> *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989)
> (recognizing stereotyping as discriminatory under Title
> VII in context of male partners' comments that female
> plaintiff did not act or dress like a woman and was too
> aggressive).  The Court held that a claim of sexual
> stereotyping has legal relevance insofar as 'Congress
> intended to strike at the entire spectrum of disparate
> treatment of men and women resulting from stereotypes.'
> Id. at 251. The theory of same-sex sexual stereotyping
> discrimination has been recognized by several circuits
> with varying levels of acceptance . . . . The Fifth
> Circuit, among others, has yet to recognize or apparently
> even approach the gender stereotyping theory of Title VII
> discrimination, under either a same-sex or opposite-sex
> fact scenario.

> The court in *Love* cited several cases from different circuits

---

[11]The Fifth Circuit has indicated an impression that the passage in *Oncale* is meant to be exhaustive: "A plaintiff in a same-sex sexual harassment case may establish discrimination because of sex by showing: (1) the alleged harasser made 'explicit or implicit proposals of sexual activity' and providing 'credible evidence that the harasser was homosexual; (2) the harasser was motivated by general hostility to the presence of members of the same sex in the workplace; or (3) direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Love v. Motiva Enterprises LLC*, 389 Fed. Appx. 900, 902 (5th Cir.2009) (internal punctuation and quotation marks omitted).  However, the *Love* decision is unpublished and, as dictated by Federal Rule of Appellate procedure 47.5.4 "Unpublished opinions issued on or after January 1, 1996*, are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case (or similarly to show double jeopardy, notice, sanctionable conduct, entitlement to attorney's fees, or the like)."

addressing claims of gender stereotyping under Title VII.[12]  These claims arise where the victim of the alleged harassment is discriminated against for a failure to conform to the stereotypes of his or her gender, that is, where plaintiff has exhibited features or characteristics inconsistent with his or her sex.  Respondent, no claim or even allegation of sexual stereotyping harassment appears in [Plaintiff's] Complaint or in [Woods'] deposition testimony.  *Id.* at *9.  Wolfe admitted in his interview

---

[12]*See, e.g.*, *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir.1999)  (recognizing same-sex sexual stereotyping, hostile environment discrimination claim under Title VII, but upholding summary judgment dismissal due to lack of factual development in summary judgment record); *Simonton v. Runyon*, 232 F.3d 33, 37-38 (2d Cir.2000) (recognizing possible Title VII same-sex sexual harassment stereotyping claim, but upholding Rule 12(b)(6) dismissal of such claim for failure to allege sufficient facts on such claim); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 263-64 (3d Cir.2001) (recognizing Title VII same-sex sexual harassment claim under theory of gender stereotyping, but upholding summary judgment dismissal for failure to present sufficient evidence of such a claim); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 571-73 (6th Cir.2004)  (recognizing Title VII sexual stereotyping harassment claim and overturning Rule 12(c) dismissal of such claim based on allegations in complaint of conduct and mannerisms of transexual male plaintiff that did not conform with employer's and coworkers sex stereotypes of how a man should be); *Doe v. City of Belleville, Ill.*, 119 F.3d 563, 580-83 (7th Cir.1996) (recognizing Title VII same-sex sexual harassment claim for sexual stereotyping based on fact that plaintiff was harassed because he wore an earring and holding that a man who is harassed because "his voice is soft, his physique is slight, his hair is long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex") (vacated and remanded on other grounds, 523 U.S. 1001 (1998)); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874 (9th Cir.2001) (recognizing Title VII same-sex sexual harassment claim under a hostile environment theory and reversing judgment against plaintiff based on fact that plaintiff proved he was harassed because of sex when his coworkers referred to him in female terms and ridiculed his allegedly female mannerisms); *Medina v. Income Support Div. of N.M .*, 413 F.3d 1131, 1135 (10th Cir.2005) (recognizing Title VII same-sex stereotyping claim under Title VII under hostile work environment theory, but affirming summary judgment dismissal of plaintiff's claim because plaintiff offered no evidence that she herself did not dress or behave like a stereotypical woman).

and deposition that he thought Woods' use of Wet Ones Wipes was feminine or "kind of homo," Wood's deposition testimony however is devoid of any direct mention of sexual stereotyping. Woods states that Wolfe would "make jokes about [Woods] being gay" but never references any gender stereotyping.[13] (Rec. Doc. No. 36-2 at 40). In the instant case, gender stereotyping as a method of proving same-sex sexual harassment in violation of Title VII is not susceptible to summary judgment at this stage of the proceedings.

C.  Retaliation

"To establish a prima facie retaliation claim, [a Plaintiff] must prove that: (1) [Plaintiff] engaged in an activity that Title VII protects; (2) [Defendant] carried out an adverse employment action; and (3) a causal nexus exists between [Plaintiff's] protected activity and [Defendant's] adverse action. *Harvill* 433 F.3d at 439 (citing *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir.1999)). If such a showing is made, and absent direct evidence of discriminatory intent, the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applicable. Thus, after the prima facie showing is made, the "employer must respond with a

---

[13]In its reply to Plaintiff's opposition, Defendant states that "substantial evidence submitted by Boh Brothers shows that Wolfe was an 'equal opportunity' harasser. Wolfe was crass and rude to everyone in the workplace . . . . Wolfe would often call employees 'queers,' 'faggots' and 'princess.'" (Rec. Doc. No. 40 at 4).

legitimate, nondiscriminatory reason for its decision." *Id.* at 802. The Fifth circuit has stated that this "burden on the employer is only one of production, not persuasion, involving no credibility assessments." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000) (referencing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)). Finally, "if the employer carries its burden, the 'mandatory inference of discrimination' created by the plaintiff's prima facie case, 'drops out of the picture' and the fact finder must 'decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination]." *Russell*, 235 F.3d at 222 (quoting *Burdine* 450 U.S. at 256 n.10; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12, (1993)).

In a claim brought for discrimination in violation of the Age Discrimination in Employment Act, discussing the analytical framework set forth in *McDonnell* and its progeny, the Supreme Court stated "[i]t suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149 (2000)

1. Protected Activity

16

Despite Defendant's statement in the instant Motion for Summary Judgment that "Woods did not engage in protected activity," John Lipani as Boh Brothers in his deposition taken pursuant to Federal Rule of Civil Procedure 30(b)(6), in response to the question "[w]ould you consider his complaining to Mr. Duckworth about Mr. Wolfe's conduct a protected activity" answered "Yes." (Rec. Doc. No. 36-10 at 19) (*see also Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)).   Thus, at a minimum, there exists a genuine issue of fact regarding whether did engaged in protected activity in filing his complaint with the EEOC.

2. <u>Adverse Employment Action</u>

The Supreme Court in *Burlington Northern and Santa Fe Ry.Co. v. White*, 548 U.S. 53, 57 (2006) held that the antiretaliaton provision of Title VII "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant."[14]

Woods was suspended without pay for three days after making

---

[14]The Court continued "[i]n the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington* 548 U.S. at 57.

17

his complaint to Duckworth, Woods believed he had been terminated. The Fifth Circuit has held that a two day suspension without pay after engaging in protected activity, constituted "adverse employment action." *LeMaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 390 (5th Cir.2007). Thus, there exists a genuine issue of material fact as to whether Woods' three day suspension without pay constitutes "adverse employment action" and thus precludes summary judgment on Plaintiff's claim of retaliation.

### 3. A Causal Nexus

As Respondent states in its opposition "[c]lose timing between an employee's protected activity and an adverse action may provide the causal connection for a *prima facie* case of retaliation."[15] (Rec. Doc. No. 36 at 30) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 561 n.28 (5th Cir.2007)). Plaintiff also argues that, because, "there is direct evidence of retaliation, the *McDonnell Douglas* burden shifting paradigm, which pertains to circumstantial evidence, does not apply." (Rec. Doc. No. 36 at 32). Plaintiff notes that Duckworth stated that he sent Woods home without pay and thereafter assigned him to work in the Almonaster yard

---

[15]*See also Grimes v. Tex. Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir.1996) (stating "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." (citations omitted)).

"specifically because he complained about Wolfe's harassment." *Id.* (citing Rec. Doc. No. 36-7 at 24-25). To the extent this constitutes direct evidence of discriminatory intent in that a jury might reasonably find Defendant liable, *McDonnell Douglas* is inapplicable and there exists a genuine issue of fact sufficient to preclude summary judgment on this issue.

To the extent Plaintiff's evidence is circumstantial and the *McDonnell Douglas* framework applies, plaintiff has made a prima facie showing, Defendant has proffered a non-discriminatory reason for its action, and Plaintiff has raised an issue of fact regarding whether Defendant's proffered reason was pretextual via Duckworth's deposition testimony as discussed *supra*.

In the instant motion, Defendant focuses on Woods' being sent to the Almonaster Yard as the alleged adverse action rather than his being suspended without pay; this misses the mark. Defendant states that Woods was "reassigned to the yard by Duckworth after Duckworth spoke to Wolfe and Carpenter about Woods attempt to view employees' time records." (Rec. Doc. No. 31-1 at 27). In its reply to Plaintiff's opposition, Defendant focuses on the suspension and proffers the same non-discriminatory reason for the suspension. (Rec. Doc. No. 40 at 8). "Woods was transferred to the yard, and sent home for a brief interim because he sought to view employees' time records, a violation of company policy." *Id.*

19

Defendant notes that Woods admitted in his deposition that Wolfe told him he was being sent to the yard due to his attempt to view employees' time sheets.  Rec. Doc. No. 40 at 8).  However, as Plaintiff notes in its opposition, Duckworth stated in his deposition that Woods "had done nothing wrong and was not being punished."[16] (Rec. Doc. NO. 36 at 31).  Thus there exists a genuine issue of fact regarding whether the proffered reason for the action was pretextual and thus, wether Defendant's action was retaliatory; thus that summary judgment of Plaintiff's retaliation claim is **DENIED.**

D.   _Ellerth/Faragher Affirmative Defense_

Movant cites _Burlington Industries, Inc. v. Ellerth_, 524 U.S. 742 (1998) and _Faragher v. City of Boca Raton_, 524 U.S. 775 (1998) to support the proposition that, where an employer takes no employment action, an affirmative defense may be raised by an employer to shield themselves from vicarious liability arising from a hostile work environment created by a supervisor. (Rec. Doc. No. 31-1 at 7).  The Supreme Court in _Ellerth_ stated:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively

---

[16]The relevant excerpt from Duckworth's deposition is as follows: "Q. When you sent Mr. Woods home, did you not think he had done anything wrong? A. No, I didn't send him home -- like I say, it wasn't punishment. I didn't see anything wrong. I just didn't want these things I was being told to escalate."  (Rec. Doc. No. 36-7 at 26).

higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.

*Id.* at 765.  Here, as noted above, there exists a genuine issue of fact as to whether the challenged action of Defendant constituted "adverse employment action."   Thus, the applicability of this affirmative defense cannot be immediately determined; therefore, Defendant's attempt to raise the *Ellerth/Faragher* affirmative defense to summarily dismiss Plaintiff's claims is **DENIED**.

New Orleans, Louisiana, this 28TH of February, 2011.

UNITED STATES DISTRICT JUDGE